[Crim. No. 42566. Second Dist., Div. One. Aug. 10, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN GOMEZ, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Laurance S. Smith, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and Jana L. Tuton, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SOVEN, J.*—Defendant John Gomez was found guilty by a jury of first degree murder and sentenced to prison for 27 years to life.

FACTS

In June 1978, defendant and his wife Celia Maldonado separated. Celia had become involved with another man, Al Herrera, the victim in this case. After the couple separated, defendant told Celia that unless she stopped taking their son when she went to Herrera's house, defendant would kill Herrera.

Celia filed a petition for dissolution of her marriage in July 1978. In November 1978, defendant and Celia met with Royal Copple, a student intern who was serving with the Fresno County Family Court Services (FCS). Defendant told Copple that he would kill Herrera when the right opportunity arose. After the session, Copple notified Judge Kessler, who had referred defendant and Celia to FCS, of the threat.

Several months after defendant and Celia separated, defendant phoned Celia's mother Mercedes Maldonado, and told her that he was going to kill Herrera because Herrera had destroyed his marriage. Defendant said that he would kill Herrera if it was "the last thing I do." Maldonado phoned Celia and Herrera and warned them.

In December 1978, defendant called Celia and told her that as soon as the divorce became final, he was going to kill Herrera. He said that

*Assigned by the Chairperson of the Judicial Council.

he would go to prison for only seven or eight years and that it would be "worth it" to make Celia suffer.

In January 1979, defendant met with another student intern, Jerry Raschmann, who was also serving with the family court services, and told Raschmann that he was going to kill Herrera. Raschmann notified both Herrera and the Fresno police of the threats.

The divorce was final in July 1979. Celia obtained a restraining order which forbade defendant to go to her residence or place of employment. Still, defendant went to Celia's apartment and told her that if she continued to allow Herrera to see their son, somebody was going to get killed. Shortly thereafter, defendant abducted their son and took him to Texas, where defendant was apprehended about a month later.

Sometime in 1979, both Celia and Herrera obtained weapons permits and guns to protect themselves from defendant. In March 1980, defendant arranged to have Celia's home burglarized in order to obtain the gun which he later used to kill Herrera.

On May 1, defendant failed to appear for a scheduled family court appointment to arrange for visitation. He called Celia the next day demanding to talk to their son, but Celia refused. Defendant told her that she would be sorry. Celia called the police.

On May 3, defendant placed a loaded weapon in his waistband and drove to Celia's house. Herrera and Herrera's son were at Celia's house working on the roof. Herrera saw defendant driving by and came down from the roof. He told Celia he was going to his own house because he was afraid defendant would vandalize his property. As Herrera walked towards his truck, defendant drove up and parked.

Defendant got out of his car; his son went over to him and defendant hugged the boy. Celia told defendant to leave. Defendant angrily ordered her to take their son into the house. In the meantime, Herrera removed a mace canister from his truck and, holding the mace can in his hand, walked towards defendant. Celia turned to go into the house to call the police. She heard Herrera ask defendant if defendant had slashed Herrera's boat. Defendant said, "Yeah. What of it?"

As defendant and Herrera stood talking, defendant pulled a gun out of his pants. Herrera held up the can of mace and sprayed defendant,

who was wearing glasses. Defendant shot Herrera, who, holding his shoulder, turned and ran towards the carport. Defendant, gun in hand, chased him across the front lawn. Herrera collapsed face down. Defendant walked up to him and shot him at very close range in the back of the head. Defendant then walked back to his car and drove away.

The next day, defendant called the Fresno Bee and arranged to meet with a reporter. He wanted to tell the reporter his side of the story. He told the reporter that he thought he saw a gun in Herrera's pocket and believed that "it was either him or me." He retrieved the murder weapon for the reporter. Defendant also demonstrated how he had held the gun near Herrera's head and shot him again. Later, defendant told the arresting officer that he saw Herrera reach toward his pocket and that he beat Herrera to the draw.

Defendant testified in his own defense. He admitted threatening to kill Herrera in conversations with the family court counselors, Celia's mother, and Celia. He admitted telling Herrera twice that he would kill him.

Defendant testified that he took the gun with him May 3 because he did not want to leave it at the garage he was renting. He did not know why he put the gun in his waistband. He went to Celia's house to see his son.

After a brief exchange of words with Herrera, defendant saw Herrera make a "movement for his side"; defendant drew his weapon and pointed it at Herrera. Defendant did not see a mace canister in Herrera's hand. Defendant heard a shot and when he was hit in the face, he thought he had been shot with a bullet. Defendant saw Herrera running away. He did not remember following Herrera or shooting Herrera in the head. He was not unconscious. However, he was blinded by the mace and his vision did not clear up until he drove several miles to an inn and washed his face.

## DISCUSSION

Defendant contends that the trial court erred in admitting evidence of threats made by defendant in conversations with his ex-wife Celia before their marriage was dissolved and during marital counseling sessions. Neither contention has merit.

## 1. *Confidential Communications*

Evidence Code section 980 provides, as relevant, that "a spouse . . . has a privilege during the marital relationship and afterwards . . . to prevent another from disclosing, a communication if . . . the communication was made in confidence between him and the other spouse while they were husband and wife."

■ Over objection, defendant's ex-wife, Celia, testified to threats made against Herrera during the period after defendant and Celia separated and before the parties' marriage was dissolved. Defendant claims that these communications were "confidential" and should have been excluded.

The contention has no merit. We leave aside the issue whether the privilege was intended to apply to communications made after a couple has separated but before the legal dissolution of the marriage is final.[1] Rather, we conclude, as contended by the People, that the communications were not made "in confidence."

While a communication between a husband and wife is presumed to be confidential, if the facts show that the communication was not intended to be kept in confidence, the communication is not privileged. (*People* v. *Carter* (1973) 34 Cal.App.3d 748, 752 [110 Cal.Rptr. 324].) During the period between June 1978 and December 1978, when defendant made the challenged threats to Celia, he made the same threats in the presence of three other people—Celia's mother, and the student interns, Copple and Raschmann. Moreover, he admitted threatening Herrera directly, during the time the dissolution was pending. After the dissolution, he continued to make similar threats to Celia.[2]

Finally, as pointed out by the attorney general, defendant had no desire that the threats be kept secret. The purpose of the threats to Celia was to terrorize her into curtailing her relationship with Herrera.

---

[1]The purpose of the privilege is to encourage free and open communication between spouses. (See Evid. Code, § 980, comment, Law Revision Com.) Once the parties have factually severed the relationship, little reason exists to protect the couple's communications or to extend a privilege to a confidential relationship that no longer exists.

[2]Defendant attempts to distinguish the nature of the threats made to Celia, after the dissolution, by noting that he tended to say that "somebody's going to get killed," or "you're going to be sorry" or "somebody was going to get hurt." That defendant changed the language of the threats does not change the character of those threats, or, more important, undermine the inference that the threats were never intended to be confidential.

In short, we are satisfied that the threats to Celia were not intended to be confidential and accordingly no privilege protected the statements.

Moreover, even if the challenged threats should have been excluded, any conceivable error was nonprejudicial. The unobjectionable evidence against defendant, described above, was overwhelming—beginning with defendant's threats against Herrera made to Celia's mother and directly to Herrera and ending with defendant's reenactment for the Fresno Bee reporter of the act of shooting Herrea in the head as he lay dying.

### 2. *Psychotherapist's Privilege*

■ Defendant contends that the trial court erred in permitting Roy Copple and Jerry Raschmann, the students serving as interns with the family court services office, to testify concerning defendant's threats against Herrera made to them.

Evidence Code section 1014 provides for a psychotherapist-patient privilege. Section 1010 defines a psychotherapist to mean, as relevant, a psychiatrist, a licensed psychologist, a licensed clinical social worker, a credentialed school psychologist, and a licensed marriage, family and child counselor.

Evidence Code section 1024, however, provides that there is no privilege "if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent threatened danger."

Finally, Evidence Code section 1028 limits any privilege in a criminal proceeding to psychiatrists and licensed psychologists.

Defendant contends, first, that the privilege applies to students; second, that the exception authorizing disclosure in section 1024 does not apply; and, third, that the limitation of the privilege in "criminal proceedings" to psychiatrists and psychologists invades his constitutional right to privacy and denies him the equal protection of the laws.

None of defendant's contentions has merit. First, and decisive of this case, the privilege does not extend to student interns; since the privilege does include virtually every licensed classification of "therapist", defen-

dant is unable on this record to provide a reason that the privilege should include "psychology students" or "student interns."[3] Second, section 1028 would not be relevant even if the privilege otherwise applied, because any privilege, even as to a psychiatrist or licensed psychologist, was negated by section 1024. All persons encompassed by section 1010, and of course Copple and Raschmann, were under an affirmative duty to communicate the threats. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 431 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].)

Defendant's theory, again assuming that the communications to the students were privileged, is that although no privilege existed when the threats were made, the communications became privileged because by the time of trial, the victim was dead and "disclosure" was no longer "necessary to prevent . . . danger." Even that contention is without merit. Section 1024 provides categorically that there "is no privilege" as to certain communications. "If the preliminary facts upon which Evidence Code section 1024 rests were present at a time prior to the injury complained of, section 1024 prevents any privilege from attaching . . . ." (*Mavroudis* v. *Superior Court* (1980) 102 Cal.App.3d 594, 604 [162 Cal.Rptr. 724]; see also *People* v. *Hopkins* (1975) 44 Cal.App.3d 669, 673-674 [119 Cal.Rptr. 61].)

Defendant's argument that his right to privacy was invaded by the communication of the threats made in the presence of the student interns is without merit. On the facts, defendant admitted that he would have made the threats even if he had known the student interns were going to report the threats. More important, our Supreme Court, attuned to the sensitivities of the psychotherapist-patient relationship (*In re Lifschutz* (1970) 2 Cal.3d 415, 431-433 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1]), considered and rejected any such rights of privacy when the court imposed on the therapist the affirmative duty to disclose threatened danger to others and indeed "to take whatever other steps

---

[3]We can assume without deciding that under some circumstances, communications to a student intern could be privileged under Evidence Code sections 1010 and 1014.

In this case, the only offer of proof was that Copple and Raschmann were psychology students "employed as interns with the Family Court Services Office and engaged . . . in marriage counseling services . . . conciliation counseling and child custody investigations."

No offer of proof was made that either student was working under the supervision of a licensee to whom the privilege does attach (see, e.g., Bus. & Prof. Code, §§ 17804.2, 17804.4).

are reasonably necessary under the circumstances." (*Tarasoff* v. *Regents of University of California, supra*, 17 Cal.3d 425, 431.)

Affirmed.

Lillie, Acting P. J., and Hanson (Thaxton), J., concurred.

A petition for a rehearing was denied September 1, 1982, and appellant's petition for a hearing by the Supreme Court was denied November 18, 1982. Newman, J., did not participate therein.