[No. H021193. Sixth Dist. Apr. 11, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD MICHAEL MARTINEZ, Defendant and Appellant.

466

■■■■■■■■■■■■■

COUNSEL

Alan Stern, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, René A. Chacón and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WUNDERLICH, J.—**

## I. *Statement of the Case*

In September 1997, defendant Richard Michael Martinez pleaded guilty to a charge of failing to register as a sex offender and was placed on probation. In April 1998, defendant admitted violating the terms of probation by again failing to register. The court revoked probation and executed the previously imposed two-year sentence. In March 1999, the Monterey County District Attorney filed a petition under Welfare and Institutions Code section 6600— known as the Sexually Violent Predators Act (SVPA)—to have defendant declared a sexually violent predator (SVP) and committed for two years.[1] In February 2000, after a nonjury trial, the court sustained the petition and committed defendant to the Department of Mental Health for a period of two years in a secure facility.

Defendant appeals from the order of commitment. He claims that the use of and testimony concerning the records of psychiatric treatment and

---

[1] A "sexually violent predator" is "a person who has been convicted of a *sexually violent offense* against two or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a)(1), italics added.)

" 'Sexually violent offense' means the following acts when committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . and result in a conviction or a finding of not guilty by reason of insanity . . . : a felony violation of paragraph (2) of subdivision (a) of Section 261 [rape], paragraph (1) of subdivision (a) of Section 262 [spousal rape], Section 264.1 [rape, spousal rape, penetration with object in concert], subdivision (a) or (b) of Section 288 [lewd conduct with a child under 14 years old], or subdivision (a) of Section 289 of the Penal Code [penetration with object], or sodomy or oral copulation in violation of Section 286 or 288a of the Penal Code." (Welf. & Inst. Code, § 6600, subd. (b).)

All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

evaluation violated his right to privacy under the California Constitution and the patient-psychotherapist privilege. He also claims the court erred in admitting hearsay evidence concerning prior acts of misconduct.

We sustain the order of commitment.

## II. *Evidence at the Commitment Trial*

In 1977, defendant forcibly and repeatedly raped a woman he did not previously know, forced her to orally copulate him, and orally copulated her. The victim sustained scratches, bruises, and abrasions. Defendant was later convicted of rape.

In 1979, defendant forcibly raped another woman and made her orally copulate him. He also beat her up and attempted to sodomize her. When she tried to escape through a window, he pulled her back inside, causing her to suffer severe cuts on the broken glass. Defendant was later convicted of rape and oral copulation.

At the SVP trial, Dr. Hy Malinek and Dr. Jack Vognsen, psychologists who evaluated defendant for the purpose determining whether he was an SVP, testified that defendant met the statutory criteria for an SVP: (1) he had previously been convicted of sexually violent offenses against at least two victims; and (2) he suffered from a diagnosed mental disorder that rendered him dangerous because of a likelihood he would commit similar offenses. (See § 6600, subd. (a)(1).)

Specifically, both experts testified that defendant's prior rape convictions qualified as predicate offenses: they reflected sexual offenses involving force and violence against two different victims.

Dr. Malinek testified that after interviewing defendant and reviewing his records, he diagnosed defendant as suffering from paraphilia or a sexual deviation not otherwise specified, which is manifested by his attraction to nonconsenting victims, and he also suffered from an antisocial personality disorder and atypical mood disorder or mood disorder not otherwise specified. According to Dr. Malinek, these disorders in combination rendered defendant likely to recommit violent sexual offenses. Dr. Malinek further found elements of sexual exhibitionism in a 1990 conviction for indecent exposure and sexual identity disorder and sexual sadism in a 1989 conviction for two counts of oral copulation. Although the prior oral copulation convictions were not sufficient standing alone to establish a diagnosis of sexual sadism, Dr. Malinek considered them along with the predicate offenses in

reaching his conclusion that defendant was likely to reoffend. The evidence of exhibitionism and sexual identity disorder also raised concerns concerning the level of defendant's sexual deviation.

Dr. Malinek concluded that defendant's long history of sexual charges and convictions reflects persistent sexually deviant urges. In reaching this conclusion, Dr. Malinek cited statements defendant made to Dr. Leonti Thompson, a psychological evaluator who had examined defendant in 1979 to determine whether at that time he qualified as a mentally disordered sex offender (MDSO). At that time, defendant described assaults on at least six victims, where there were no criminal reports or arrests. Concerning one such victim, defendant said that "[s]omething came over him" while talking to a woman, and he "yanked her down on the couch" and told her they were going to "[g]et down." Dr. Malinek opined that defendant's history reflects "a pattern of significant urges and a sexually inappropriate acting out, repeated crimes over a period of years" that has affected his "emotional and volitional capacity, the way he regulates feelings, and the way he expresses them, and certainly the kinds of behavioral choices he made or did not make."

Dr. Malinek also opined that defendant's urges had impaired his social and occupational abilities. In this regard, Dr. Malinek noted as evidence the fact that defendant was first incarcerated in 1969 for robbery and assault and after his release on parole he repeatedly violated parole, resulting in his being kept in custody for most of the time between 1969 and 1976. After his release, he committed the predicate offenses and was in custody at Atascadero State Hospital (ASH) until approximately 1985 because he was determined to be an MDSO based on a diagnosis of paraphilia. Dr. Malinek cited reports from a member of defendant's treatment team and concurred with her opinion that defendant had disorders of atypical paraphilia, aggressive sexual assault, and antipersonality disorder. Moreover, the records and medical reports during his years at ASH revealed that he did not benefit from treatment and was returned to court and sent to prison. Again, he was released but later violated parole after committing a number of offenses, including indecent exposure and oral copulation in 1989, 1990, and 1993.

Concerning defendant's antisocial personality disorder, Dr. Malinek based his diagnoses on defendant's long history of antisocial attitudes and acts, beginning in adolescence with juvenile arrests and incarcerations and continuing with approximately 39 arrests as an adult. Dr. Malinek opined that this disorder impaired defendant's ability to respect the law, control his impulses to perform a variety of antisocial and sexual acts, and learn from his experience. In support of his opinion, Dr. Malinek cited an incident

where defendant forced a fellow jail inmate to orally copulate him. He testified, "When you engage in these kinds of crime[s] and you're in custody for another rape, one wonders if you are at all able to exert any control over sexual deviant fantasies and urges."

Based on reports that defendant started to abuse alcohol at an early age and had multiple arrests for drunk and disorderly conduct, Dr. Malinek found that defendant suffered from chronic substance abuse. Defendant acknowledged this problem during his interview with Dr. Malinek. Defendant also acknowledged that he had a history of bipolar disorder or many mood swings and had been taking medication for it while in prison.

In making a risk assessment, Dr. Malinek used two actuarial risk assessment formulae: the Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR) and the Hare Psychopathy CheckList (HPCL). Defendant's scores on both tests indicated he was at high risk. Based on these tests, his interview with defendant, and defendant's records, Dr. Malinek deemed defendant at high risk of reoffending if released.

Dr. Vognsen reviewed all of the material in defendant's cumulative prison file, reports concerning sexual and nonsexual offenses other than the two predicate offenses, and evaluations of defendant by treating and nontreating staff at ASH. He diagnosed defendant with paraphilia, with a preference for sex with nonconsenting male and female partners, antisocial personality disorder, and substance abuse. He opined that these disorders severely affected defendant's volitional capacity and emotional control such that his abnormal sexual urges toward others predisposes him to reoffend by committing sexually violent crimes. Dr. Vognsen saw evidence that defendant had suffered paraphilia for over 25 years. He too gave defendant the HPCL and RRASOR assessments, and defendant's score put him in the high-risk category. In all, he concluded that given defendant's disorders, it was very likely he would reoffend if released.

Javier Aboytes, a correctional officer at Soledad testified that in 1998, defendant requested mental health services, complaining of suicidal ideas, paranoia, nervousness, sadness, and poor appetite. He also said he had "enemy problems," had attempted suicide in the past, and was thinking about it again. He requested a transfer to another prison.

Dr. Ann Reichert, a psychiatrist at Soledad prison who manages medications for inmates, met with defendant at his request. She prescribed medication to help him sleep and as an antipsychotic for severe anxiety or dysphoria. At the time, defendant was in the mental health population because of

mental illness or a personality disorder. Using defendant's medical records, she discussed the previous medications that had been given to defendant as well as the medications she prescribed.

Defendant's older brother Manuel Martinez testified that in 1997 he helped his mother get a restraining order against defendant after defendant, who had been drinking, got into a fight with another older brother. Martinez testified that defendant sometimes abuses alcohol and is easily angered, and when drunk, he gets violent and does not listen to people.

Officer Jacqueline Bohn of the Salinas Police Department testified that in 1998 she arrested defendant for public intoxication. At the time, he was lying near a garbage Dumpster moaning and groaning. He smelled of alcohol, his fly was open, and he had urinated on himself. He was also charged with possession of marijuana and violating his probation.

## The Defense

Theodore Donaldson, M.D., opined that defendant did not meet the criteria for an SVP. He found no evidence that defendant was volitionally impaired or unable to control his behavior. According to Dr. Donaldson, defendant knew what he wanted and intentionally acted to get it. He also considered Dr. Malinek's prediction of future conduct "cloudy." Nevertheless, he agreed that defendant met the criteria for a diagnosis of antisocial personality disorder and suffered from alcohol abuse. He was not sure if defendant had a mood disorder and did not believe that defendant suffered from paraphilia. Although he did not think it likely defendant would reoffend, he conceded there was between a 30 and 60 percent chance that he might.

John Podboy, M.D., testified that the assessment of future risk of criminal behavior is a controversial area and psychological professionals do not agree that future criminality can be predicted. He administered the Millen V Clinical Multi-Action Inventory Summary 3 test on defendant, and the results indicated that defendant had an alcohol problem and a narcissistic personality disorder. He did not find that defendant suffered from a mental disorder that rendered it likely he would reoffend. He thought defendant could encounter problems if he abused alcohol, but he noted evidence suggesting that he would not do so. Dr. Podboy acknowledged that based solely on defendant's RRASOR scale he was likely to reoffend, and, to a degree, he agreed that past behavior may be the best indicator of future behavior.

## III. Defendant's Right to Privacy

Defendant notes that the deputy district attorney (hereafter prosecutor) was given access to and then examined defendant's psychological

records concerning medication and treatment at ASH. He claims the prosecutor violated his state constitutional right to privacy. (Cal. Const., art. I, § 1.) Citing *Barber v. Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818], defendant further claims the violation constitutes structural error that is reversible per se. We disagree with both claims.

■ Article I, section 1 of the California Constitution (hereafter Section 1) provides, among other things, that "[a]ll people" have an "inalienable" right to "privacy."[2] Section 1 "is intended to be self-executing, i.e., . . . the constitutional provision, in itself, 'creates a legal and enforceable right of privacy for every Californian.' " (*White v. Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222].) It "protects Californians against invasions of privacy by nongovernmental as well as governmental parties." (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 227 [74 Cal.Rptr.2d 843, 955 P.2d 469]; *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 15-20 [26 Cal.Rptr.2d 834, 865 P.2d 633] (hereafter *Hill*).)

In *Hill, supra*, 7 Cal.4th 1, the court developed an analytical framework for deciding questions arising under the privacy guarantee in Section 1. (7 Cal.4th at pp. 35-40; see *Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1068 [95 Cal.Rptr.2d 864]; *Rains v. Belshé* (1995) 32 Cal.App.4th 157, 167 [38 Cal.Rptr.2d 185].) The court explained that to prove a violation of this constitutional guarantee, one must establish a legally protected privacy interest, a reasonable expectation of privacy in the circumstances, and conduct constituting a serious invasion of the privacy interest. (*Hill, supra*, 7 Cal.4th at pp. 35-37, 39-40.) The court further explained that even if one establishes these elements, a constitutional violation may still not be found where the invasion is justified by competing or countervailing privacy and nonprivacy interests. (*Id.* at pp. 37-38, 40.)[3]

## A. Privacy Interest

"Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court." (*Hill, supra*, 7 Cal.4th at p. 40.) ■ It is settled that a person's medical history, including psychological records, falls within the zone of informational privacy protected

---

[2]"All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." (Cal. Const., art. I, § 1.)

[3]In *Hill*, student athletes at Stanford University sought to enjoin the National Collegiate Athletic Association from employing a nonconsensual drug testing program, including observation of urination, the medical testing of urine, and the exchange of confidential medical information attendant upon the administration of the drug testing, claiming the program violated their rights of privacy under Section 1. The court held that it did not. (*Hill, supra*, 7 Cal.4th at p. 57.)

under Section 1. (See 7 Cal.4th at pp. 41, 52; *In re Lifschutz* (1970) 2 Cal.3d 415, 431-432 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1]; *Jeffrey H. v. Imai, Tadlock & Keeney* (2000) 85 Cal.App.4th 345, 353 [86 Cal.App.4th 25i, 101 Cal.Rptr.2d 916]; *Johnson v. Superior Court, supra,* 80 Cal.App.4th at p. 1068; *Lantz v. Superior Court* (1994) 28 Cal.App.4th 1839, 1853 [34 Cal.Rptr.2d 358]; *Cutter v. Brownbridge* (1986) 183 Cal.App.3d 836, 841-843 [228 Cal.Rptr. 545].) As the court in *Board of Medical Quality Assurance v. Gherardini* (1979) 93 Cal.App.3d 669, 678 [156 Cal.Rptr. 55], observed, "A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected." Thus, here it is beyond reasonable dispute that the disclosure and examination of defendant's medical and psychological records implicate a legally recognized privacy interest.

## B. *Reasonable Expectation of Privacy*

■ " 'The extent of [a privacy] interest is not independent of the circumstances.' [Citation.] Even when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy. For example, advance notice of an impending action may serve to ' "limit [an] intrusion upon personal dignity and security" ' that would otherwise be regarded as serious. [Citation.] [¶] In addition, customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy. [Citations.]" (*Hill, supra,* 7 Cal.4th at p. 36.) Whether a plaintiff has a reasonable expectation of privacy in the circumstances presents a mixed question of law and fact. (*Id.* at p. 40.)

■ Defendant's reasonable expectation of privacy in his medical/psychological records must be evaluated in light of his criminal background, his status as a prisoner, and the provisions of the SVPA.

Notwithstanding the inevitable restrictions on one's freedom and privacy in prison (see *Thor v. Superior Court* (1993) 5 Cal.4th 725, 744 [21 Cal.Rptr.2d 357, 855 P.2d 375]; Pen. Code, § 2600), defendant's status as a prisoner did not automatically eliminate his expectation of privacy concerning his psychological records. Indeed, all medical information and records obtained by the state in providing services to those subject to criminal incarceration are confidential and may be released and disclosed only as specified by statute. (See Civ. Code, § 56.10 et seq.) Likewise, treatment records generated during civil commitments are confidential. (See §§ 5328-5328.15.) Nevertheless, as we explain below, the SVPA contemplates and expressly provides for the disclosure of all relevant records, including

medical and psychological records, and their consideration in an SVP commitment proceeding.[4]

Under the SVPA, the Director of Corrections has the initial responsibility to determine whether a prisoner may be a sexually violent predator. (§ 6601, subd. (a).) For this purpose, prisoners are screened by the Department of Corrections and the Board of Prison Terms based on whether they committed one of the statutorily enumerated sexually violent offenses (see fn. 1, *ante*) and on "a review of the person's social, criminal, and institutional history." (§ 6601, subd. (b).)

If a prisoner has qualifying prior convictions, then he or she is evaluated by the Department of Mental Health under a "standardized assessment protocol," which "shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and *psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder.*" (§ 6601, subd. (c), italics added.) In particular, this assessment is performed by two psychological professionals, and if both agree that the prisoner qualifies as an SVP, then the Director of Mental Health must forward a request for a commitment to county-designated counsel. (§ 6601, subd. (d).) If the assessors disagree on the issue, then the Director of Mental Health must arrange further examination by two more independent psychological professionals. Only if both concur that the prisoner qualifies as an SVP, must the director forward a request for a commitment petition to county-designated counsel. (§ 6601, subd. (e).) If and when a request is forwarded, "[c]opies of the evaluation reports and any other supporting documents shall be made available to the [county-designated counsel] . . . who may file a petition for commitment." (§ 6601, subds. (d) & (h).) Thereafter, the county-designated counsel must file a petition for commitment if he or she "concurs with the recommendation" from the Director of Mental Health. (§ 6600, subd. (i).)

As these provisions reveal, the SVPA makes psychological records, especially those generated at ASH, relevant in determining whether a prisoner qualifies as an SVP. In addition, the SVPA contemplates that the psychological evaluators will have access to and consider these records in rendering their opinions and writing their reports. Moreover, since the Director of

---

[4]Issues concerning the confidentiality of a prisoner's medical records in an SVP proceeding are currently before the California Supreme Court in *Garcetti v. Superior Court* (2000) 85 Cal.App.4th 782 [102 Cal.Rptr.2d 440], review granted March 21, 2001, S094812 and *Albertson v. Superior Court* (Cal.App.) review granted March 29, 2000, S085899.

Corrections, the Director of Mental Health, and the prosecutor make important independent determinations concerning whether to seek an SVP commitment, the SVPA contemplates that these officials will review the reports of the psychological evaluators and thus learn information contained in psychological records that the evaluators considered relevant. Furthermore, not only is the prosecutor authorized to review the two evaluation reports, but "any other supporting documents" must be made "available" to the prosecutor so that he or she can decide whether to file a commitment petition. (§ 6601, subd. (d).) In our view, the psychological reports expressly relied upon by the evaluators in their reports reasonably fall within the ambit of the phrase "other supporting documents" which must be made "available" to the district attorney along with the request for a commitment petition. (*Ibid.*)

Here, defendant was evaluated by Drs. Vognsen and Malinek. Both advised him that the SVP evaluations would include a review of his criminal and institutional records, as well as clinical interviews with licensed psychiatrists or psychologists, and that any information he provided during the evaluations could be included in written reports and testimony. (See §§ 5328, subd. (a), 6601, subd. (f).) Defendant signed written consent forms for both evaluations. Both doctors ultimately agreed that defendant qualified as an SVP and wrote extensive reports supporting their evaluations. In these reports, Drs. Vognsen and Malinek listed the documentary support upon which they relied, which included defendant's psychological records and previous evaluations by and interviews with licensed mental health professionals. Both doctors summarized and discussed the relevant information contained in defendant's psychological records.

Given defendant's consent to the interviews with Drs. Vognsen and Malinek, the proper disclosure of all relevant information in his psychological records to them, their discussion of this information in their written reports, the availability of the two reports to the Director of Corrections, Director of Mental Health, and the prosecutor, and the availability of the underlying psychological records to the prosecutor, we conclude that any expectation of privacy defendant had concerning those psychological records and the information revealed in the SVP evaluations by Drs. Malinek and Vognsen was substantially diminished—if not completely eliminated—with respect to their disclosure to the prosecutor in the SVP commitment proceeding. (Cf. *Hill, supra,* 7 Cal.4th 1 [athletes have diminished expectation of privacy concerning observation during urination and medical information relevant to drug testing]; *Rosales v. City of Los Angeles* (2000) 82 Cal.App.4th 419 [98 Cal.Rptr.2d 144] [employee peace officer has no expectation of privacy concerning personnel records in litigation by third

party against employee based on officer's conduct]; *Johnson v. Superior Court, supra,* 80 Cal.App.4th 1050 [sperm donor has reduced expectation of privacy concerning disclosure of nonidentifying medical information].)

## C. *Seriousness of the Invasive Conduct*

In *Hill, supra,* 7 Cal.4th 1, the court explained, "No community could function if every intrusion into the realm of private action, no matter how slight or trivial, gave rise to a cause of action for invasion of privacy. 'Complete privacy does not exist in this world except in a desert, and anyone who is not a hermit must expect and endure the ordinary incidents of the community life of which he is a part.' [Citation.] Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right. Thus, the extent and gravity of the invasion is an indispensable consideration in assessing an alleged invasion of privacy." (*Id.* at p. 37.)

In the abstract, the unauthorized disclosure and review of a person's medical records, including psychological evaluations and interviews, may be considered a serious invasion of his or her right to informational privacy. However, we do not view the prosecutor's examination of defendant's records in the abstract but rather in the limited context of a request by the Department of Mental Health for an SVP commitment and the prosecutor's evaluation and decision to seek a commitment. As noted, in this context, defendant's expectation of privacy concerning his records is substantially reduced. Moreover, defendant's mental state is the primary focus of the commitment proceeding. Under these circumstances, the prosecutor's examination of relevant psychological records that have already been disclosed, examined, relied upon, and extensively summarized by nontreating doctors does not, in our view, represent an egregious invasion of defendant's privacy. (Cf. *Jeffrey H. v. Imai, Tadlock & Keeney, supra,* 85 Cal.App.4th 345 [cause of action stated based on unauthorized release of medical records concerning HIV (human immunodeficiency virus) status].)

## D. *Competing or Countervailing Interests*

"Privacy concerns are not absolute; they must be balanced against other important interests. [Citation.] '[N]ot every act which has some impact on personal privacy invokes the protections of [our Constitution] . . . . [A] court should not play the trump card of unconstitutionality to protect absolutely every assertion of individual privacy.' [Citation.] [¶] The diverse and somewhat amorphous character of the privacy right necessarily requires that

privacy interests be specifically identified and carefully compared with competing or countervailing privacy and nonprivacy interests in a 'balancing test.' The comparison and balancing of diverse interests is central to the privacy jurisprudence of both common and constitutional law. [¶] *Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest.* Legitimate interests derive from the legally authorized and socially beneficial activities of government and private entities. Their relative importance is determined by their proximity to the central functions of a particular public or private enterprise. Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests. [Citations.]" (*Hill, supra,* 7 Cal.4th at pp. 37-38, italics added.)

■ The People persuasively argue that any invasion of a privacy caused by the prosecutor's examination of defendant's psychological records was justified by a "compelling state interest."[5]

■ The purpose of the SVPA "is to assure that potential sexually violent predators are identified, evaluated, and committed before their release into the community." (*People v. Superior Court (Whitley)* (1999) 68 Cal.App.4th 1383, 1391 [81 Cal.Rptr.2d 189].) As the California Supreme Court explained, the SVPA is "narrowly focused on a select group of violent criminal offenders who commit particular forms of predatory sex acts against both adults and children" and whose dangerousness stemming from their mental disorder makes them likely to continue such conduct even after punishment for their crime. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1153, fn. 20 [81 Cal.Rptr.2d 492, 969 P.2d 584].) "The problem targeted by the [SVPA] is acute, and the state interests—protection of the public and mental health treatment—are compelling." (*Ibid.*; see *People v. Green* (2000) 79 Cal.App.4th 921, 927 [94 Cal.Rptr.2d 355] [compelling interests behind SVPA justified differences in trial procedures for SVP's and MDSO's];

---

[5]In *Hill, supra,* 7 Cal.4th 1, the court held that not *every* assertion of a privacy interest under Section 1 must be overcome by a *compelling* interest. (7 Cal.4th at pp. 34-35.) "The particular context, i.e., the specific kind of privacy interest involved and the nature and seriousness of the invasion and any countervailing interests, remains the critical factor in the analysis. Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a 'compelling interest' must be present to overcome the vital privacy interest. If, in contrast, the privacy interest is less central, or in bona fide dispute, general balancing tests are employed." (*Id.* at p. 34, fn. omitted.)

In *Johnson v. Superior Court, supra,* 80 Cal.App.4th 1050, the court stated that a compelling interest was necessary to justify a discovery order directing the disclosure of a sperm donor's medical history. (*Id.* at p. 1071.)

Here, we shall assume for purposes of argument only that the disclosure of psychological records to the prosecutor must be justified by a *compelling* state interest.

*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155 [88 Cal.Rptr.2d 696] [same re differences in treatment of MDSO's]; *People v. Poe* (1999) 74 Cal.App.4th 826, 836 [88 Cal.Rptr.2d 437] [same re differences in availability of custody credit]; cf. *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 171 [167 Cal.Rptr. 854, 616 P.2d 836] [upholding Lanterman-Petris-Short Act conservatorships for criminal incompetents in light of "compelling interests in public safety and in humane treatment of the mentally disturbed"]; *People v. Saffell* (1979) 25 Cal.3d 223, 232-233 [157 Cal.Rptr. 897, 599 P.2d 92] [upholding maximum-term provisions of MDSO Act in light of the "dual compelling state interest in providing effective treatment for those disposed to . . . criminal [sexual] acts, [and in] assuring the safety of the public"].)

█  Under the SVPA, the prosecutor plays an integral role in achieving its purposes. As noted, where the Director of Mental Health has submitted a request for an SVP commitment, the prosecutor is vested with the authority to decide whether to file a petition and, therefore must make an independent determination. (§ 6601, subd. (i).) To perform this function, the prosecutor must be able to review the bases for a requested commitment, including the reports prepared by psychological evaluators and the documentary evidence they relied upon in preparing their reports. (See § 6601, subds. (d) & (h).)

As previously discussed, the prosecutor's examination of psychological records expressly relied upon by Drs. Vognsen and Malinek constitutes at most a minimal invasion due to defendant's substantially diminished expectation of privacy concerning those records. We further find that such a minimal intrusion is justified by the compelling public interests behind the SVPA and the prosecutor's duty to make an independent and informed decision concerning whether to file a petition. Indeed, the ability to make an informed decision can redound to a prisoner's benefit if the prosecutor disagrees with the request and declines to file a petition.

### E. Review of Alleged Constitutional Violation

Even assuming for purposes of argument only that the prosecutor's examination of psychological records violated defendant's constitutional right of privacy, we would reject defendant's claim that the error is reversible per se.

█  "A structural defect is the type of error 'affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself,' one that ' "transcends the criminal process" ' and 'def[ies] analysis by "harmless-error" standards.' [Citation.] Examples of structural

defects include total deprivation of the right to counsel at trial [citation]; trial before a judge who is not impartial [citation]; and the giving of a constitutionally defective instruction on reasonable doubt [citation]. Trial errors, by contrast, are errors that 'occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented' in order to determine whether the error was harmless. [Citation.] There is a strong presumption any error falls within the latter category, and it is the rare case in which a constitutional violation will not be subject to harmless error analysis. [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 851 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

Here, the alleged invasion of privacy concerning defendant's psychological records did not deprive defendant of his right to counsel, implicate the impartiality of the trial judge, or lessen the prosecutor's burden of proof. Nor could it have caused a structural defect of similar magnitude that prevented defendant from receiving a fair trial. Defendant's reliance on *Barber v. Municipal Court, supra,* 24 Cal.3d 742 does not suggest otherwise.

In *Barber,* an undercover government agent posing as a codefendant infiltrated confidential meetings between misdemeanor defendants and their attorney. (*Barber v. Municipal Court, supra,* 24 Cal.3d at pp. 745-750.) The Supreme Court held that such conduct violated the defendant's right to counsel and created a "chilling effect" on the attorney-client relationship. (*Id.* at pp. 750-756.) Under the circumstances, the court ruled that dismissal, rather than the exclusion of evidence, was the appropriate remedy because (1) the prejudice to the attorney-client relationship and the right to counsel could not be determined and (2) only dismissal could adequately protect the defendant's rights and deter state officials from perpetrating unlawful intrusions in the future. (*Id.* at pp. 756-760; see *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252 [36 Cal.Rptr.2d 210] [dismissal where prosecutor eavesdropped on attorney-client conversation].)

Here, the examination of records by the prosecutor did not intrude upon the attorney-client relationship or otherwise implicate defendant's right to counsel. Moreover, we note that the *Barber* rule of dismissal has been limited to cases in which prejudice to the defendant's Sixth Amendment rights cannot be reasonably measured. However, "[w]hen a reviewing court is satisfied that no prejudice could have occurred, suppression is generally found to be an adequate remedy, even where the violation of the defendant's Sixth Amendment rights was deliberate. [Citations.]" (*People v. Garewal* (1985) 173 Cal.App.3d 285, 292 [218 Cal.Rptr. 690]; accord, *People v. Cantrell* (1992) 7 Cal.App.4th 523, 550 [9 Cal.Rptr.2d 188]; e.g., *People v. Alvarez* (1996) 14 Cal.4th 155, 236 [58 Cal.Rptr.2d 385, 926 P.2d

365] [improper disclosure of defense information by interpreter deemed harmless].)

■ Defendant argues that the prosecutor's examination of files was prejudicial because it "permitted the [prosecutor] to plan her case and base it upon private information that should not have been available to her. It enabled her to use private conversations, made by [defendant] to former treating psychologists or psychological technicians, containing extremely damaging claims by [defendant] of other *alleged* sexual crimes. She used that information to conduct her examination of witnesses to embellish the claim that [defendant's] history, including mere allegations of impropriety, warranted a determination that he was a SVP." (Original italics.) This argument is meritless.

The examination of records by the prosecutor was harmless. The relevant information in the records was available to the prosecutor in summary form in the reports from Drs. Vognsen and Malinek. Defendant concedes that these witnesses were authorized to examine and consider defendant's records, and because they relied upon these records in forming their opinions, it was proper for the prosecutor to examine them concerning this information. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 81 [5 Cal.Rptr.2d 495, 825 P.2d 388] ["It is proper to question an expert about matter on which the expert bases his or her opinion and on the reasons for that opinion"].) Moreover, their testimony constituted substantial, if not compelling, evidence to support the trial court's decision to sustain the commitment petition. Consequently, any impropriety by the prosecutor in reviewing defendant's records was harmless under any standard of review. (See *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

IV. *Defendant's Statements to Former Treating Psychologists*

■ Defendant notes that in writing their reports, both Drs. Malinek and Vognsen considered previous psychiatric evaluations by treating psychotherapists and assisting technicians and by Dr. Thompson, the psychological evaluator who had examined defendant to determine whether at that time he qualified an MDSO. Defendant further notes that in explaining the bases for their opinions at trial, (1) Dr. Malinek testified about the diagnoses made by three members of defendant's treatment team at ASH in the 1982 and 1983; (2) Dr. Vognsen testified about the evaluations made by two members of defendant's treatment team in 1984 and 1985; and (3) both Drs. Malinek and Vognsen testified about statements defendant made to Dr. Thompson about several uncharged rapes and defendant's feelings when he committed them.

Defendant claims that all of these records and reports are protected by the psychotherapist-patient privilege, and, therefore, Drs. Vognsen's and Malinek's use of and testimony about them violated his privilege. We disagree.

In *People v. Lakey* (1980) 102 Cal.App.3d 962 [162 Cal.Rptr. 653], the defendant was committed to ASH as an MDSO and during the course of his commitment he was treated by various psychotherapists. At a recommitment proceeding, statements he made during treatment were admitted. On appeal, the defendant claimed these statements were privileged and should have been excluded. (*People v. Lakey, supra,* 102 Cal.App.3d at pp. 967-968, 976.) In rejecting this claim, the court acknowledged that " 'an environment of confidentiality of treatment is vitally important to the successful operation of psychotherapy' [citation], and that the effectiveness of the treatment given defendant and others similarly situated probably would be improved if complete confidentiality were accorded every statement made by a person involuntarily confined for the treatment of their mental disorders." (*Id.* at p. 976.) Nevertheless, the court recognized that "the psychotherapist/patient privilege is legislatively created and is not absolute. Defendant has been confined as an MDSO because he took the life of another human being and is dangerous. The purpose of his confinement is not merely to treat his mental disorder, but to protect society. An important purpose of the close supervision given persons who are confined as MDSOs is to gather information through which it is possible to predict their future behavior. It seems apparent that one legislative purpose in providing psychotherapy for MDSOs is to monitor their progress so that the decision to release the MDSO from confinement may be based upon as much information as possible. We cannot find any legislative intent to exclude testimony such as that presented in this matter because of any psychotherapist/patient privilege. [¶] We believe our decision is supported by Evidence Code section 1024 which provides as follows: 'There is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger.' [¶] The proceeding below was premised upon the belief of defendant's psychotherapist, and the medical staff at [ASH], that defendant constitutes 'a serious threat of substantial harm to the health and safety of others,' as provided in [former] section 6316.2. As the Supreme Court stated in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 442 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], 'the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others. The protective privilege ends where the

public peril begins.' " (*People v. Lakey, supra,* 102 Cal.App.3d at pp. 976-977; accord, *People v. Henderson* (1981) 117 Cal.App.3d 740, 748-749 [172 Cal.Rptr. 858]; see *People v. Poggi* (1980) 107 Cal.App.3d 581, 586 [165 Cal.Rptr. 758].)

We agree with the reasoning in *Lakey* and consider it applicable in the context of an SVP proceeding. The SVPA protects the public from sexual predators by detaining them and providing treatment until the mental condition causing their disorder has abated. The determination that a disorder has abated requires a full assessment of the person's current mental condition, including reference to treatment records and progress in therapy. To this end, we conclude that the psychotherapist-patient privilege did not preclude Drs. Malinek and Vognsen from considering defendant's therapy records because the privilege never attached to his communications with the treatment staff at ASH or the MDSO evaluator. Indeed, given *Lakey,* an MDSO commitment, the purpose of his initial evaluation and subsequent supervision and treatment, defendant could not have expected his communications to be absolutely confidential or otherwise protected by the privilege.

This is especially so concerning Dr. Thompson's MDSO evaluation and report because she was appointed by the court (see former § 6307 [appointment of psychologists]), and her report was filed with the Contra Costa Superior Court in the MDSO proceeding. Evidence Code section 1017, subdivision (a) broadly provides, *"There is no privilege under this article* if the psychotherapist is appointed by order of a court to examine the patient," unless the appointment is at the request of the defense in a criminal proceeding.[6] (Italics added.)

Defendant concedes that Dr. Thompson's report was not privileged *in the 1979 MDSO proceeding.* However, he argues that he "waived" the privilege only for that proceeding and not for subsequent proceedings, including the current SVP commitment. We disagree.[7]

---

[6]Evidence Code section 1017, subdivision (b) similarly provides that there is *no privilege* if the psychotherapist is appointed by Board of Prison Terms in proceedings under Penal Code section 2960 (MDSO commitment). Here, however, defendant was committed under former section 6300. Moreover, Evidence Code section 1017, subdivision (b) was enacted in 1987 after defendant was committed and *Lakey* was filed. (See Stats. 1987, ch. 687, § 1, p. 2178.)

[7]Defendant erroneously asserts that under Evidence Code section 1004, there is no psychotherapist-patient privilege in proceedings to commit a patient. Evidence Code section 1004 provides: "There is no privilege *under this article* in a proceeding to commit the patient or otherwise place him or his property, or both, under the control of another because of his alleged mental or physical condition." (Italics added.) "[T]his article," however, is article 6, which establishes the physician-patient privilege (Evid. Code, §§ 990-1007), not article 7, which establishes the psychotherapist-patient privilege (Evid. Code, §§ 1010-1027). Defend-

Although *Lakey* involved the disclosure of defendant's statements in an MDSO proceeding, they were admissible not because defendant had selectively *waived* the privilege for that proceeding but because the statements were not privileged in the first place. Defendant cites, and we have found, no authority for the proposition that a nonprivileged communication can become privileged in subsequent proceedings. Case law is to the contrary. In *People v. Gomez* (1982) 134 Cal.App.3d 874 [185 Cal.Rptr. 155], the defendant made statements that reasonably suggested he posed a danger to others. He conceded that under Evidence Code section 1024, quoted above in *Lakey*, his statements were not privileged when uttered. However, he claimed they became privileged by the time of trial because their disclosure was no longer required to prevent danger. In rejecting this argument, the court stated, "Section 1024 provides categorically that there 'is no privilege' as to certain communications. 'If the preliminary facts upon which Evidence Code section 1024 rests were present at the time prior to the injury complained of, section 1024 *prevents any privilege from attaching . . . .*' [Citations.]" (*People v. Gomez, supra,* at p. 881, italics added, quoting *Mavroudis v. Superior Court* (1980) 102 Cal.App.3d 594, 604 [162 Cal.Rptr. 724]; see *People v. Hopkins* (1975) 44 Cal.App.3d 669, 673-674 [119 Cal.Rptr. 61].)

Furthermore, we consider it counterintuitive to find that defendant's unprivileged MDSO statements became privileged in the SVP commitment proceeding. As noted above, Dr. Thompson's report was properly and publicly filed with the superior court in the MDSO proceeding. That proceeding and the instant SVP proceedings share the same fundamental purpose: to protect the public from those who because of their mental disorder represent a danger to others. And although Dr. Thompson's report may have had more immediate relevance concerning his dangerousness and the need for a commitment in 1979, both Drs. Malinek and Vognsen considered it relevant in forming their opinions concerning his dangerousness and the need for an SVP commitment in 2000.

In sum, therefore, we find no violation of the psychotherapist-patient privilege in this case.

## V.  *Evidence of Other Misconduct*

■ Defendant notes that the court admitted documentary evidence of a 1989 conviction for two counts of oral copulation. He also notes that the

---

ant's mistake, however, reveals an anomaly: In a civil proceeding to commit a person because of his or her mental condition, the Evidence Code denies the privilege to communications between the person and his or her *physician* but not to communications between the person and his or her psychotherapist, even though the latter communications would certainly be as relevant as the former.

court permitted the psychological experts to reiterate hearsay in this documentary evidence about other misconduct: a 1971 charge of rape and oral copulation that did not result in a conviction; a 1988 incident of cross-dressing; a 1990 conviction for indecent exposure; several uncharged acts of forcible sex described to Dr. Thompson; and an admission by defendant that he committed aggressive sexual assaults while on probation from his first predicate offense. Defendant claims the evidence was inadmissible hearsay. This claim is meritless.

Initially, we note that the record does not reveal an objection to evidence concerning the 1988 cross-dressing incident, the 1990 conviction for indecent exposure, the uncharged acts defendant described to Dr. Thompson, and other admissions by defendant. Hence, he waived any claim that this evidence was erroneously admitted. (See Evid. Code, § 353.)

Defendant suggests that when defense counsel objected to evidence as "character assassination" and accused the prosecutor of trying to "splash mud on the defendant," he properly raised hearsay objections to all evidence of misconduct other than the predicate offenses. We disagree. The "character assassination" objection was directed at evidence concerning an arrest for misdemeanor possession of marijuana. And the "splashing mud" accusation was directed at the 1989 oral copulation convictions. These objections did not preserve defendant's appellate claims concerning any other evidence.

Concerning the admission of documentary evidence of the 1989 convictions for oral copulation, to which there was a proper objection, defendant concedes this evidence was properly before the court for the nonhearsay purpose of revealing the bases for Drs. Vognsen's and Malinek's opinions. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713].) However, defendant notes that in ruling on the petition, the trial court stated that "based upon the evidence, [defendant] does have recurrent, intensely sexually arousing fantasies, sexual urges and behaviors involving non-consenting adults that have occurred basically over his entire adult life, and also the additional currently diagnosed mental disorders of antisocial personality disorder and his alcohol dependency abuse exacerbate [his] paraphilia." Defendant claims that this passage reveals that trial court relied on the hearsay evidence for the truth.

Even if we assume for purposes of argument only that the court considered the documents and testimony about defendant's 1989 convictions for the truth, we would find the error harmless.

In his report, Dr. Vognsen recounted in detail defendant's criminal and psychosexual history and treatment. He opined that since his teenage years,

defendant has suffered from conduct disorders and had a pervasive disregard for and aggressiveness toward others. Moreover, from age 25, defendant had repeatedly been charged with and convicted of sexually aggressive behavior and admitted similar behavior for which he was not arrested.

Similarly, in his report, Dr. Malinek diagnosed defendant with paraphilia, among other things. He explained, "The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), describes paraphilia as an arousal response to sexual objects or situations which deviates from normal arousal activity patterns, in that it interferes with varying degrees with the capacity for reciprocal affectional sexual activity. Paraphilia involves recurrent and intense sexual urges, fantasies and behavior which involve non-human objects, the suffering or humiliation of self or others, and children or non-consenting victims. To earn this diagnosis, such urges, fantasies and/or behaviors must be present for at least half a year. In this particular case, the records suggest a life long paraphilia, with multiple non-consenting victims." Dr. Malinek provided the factual bases for his opinion, recounting in detail the available history of defendant's antisocial conduct since a teenager, his criminal record, including arrests and admitted conduct for which he was not arrested, his convictions, and his psychiatric treatment and evaluations.

Clearly, the trial court's finding that defendant has "recurrent, intensely sexually arousing fantasies, sexual urges and behaviors involving non-consenting adults that have occurred basically over his entire adult life" merely reiterates the opinions of both expert evaluators. In our view, even if the court limited its consideration of the 1989 convictions to a proper, nonhearsay purpose, it is not reasonably probable the court would have had a different view concerning whether defendant had recurring sexual fantasies and urges throughout his life or, more importantly, whether defendant qualified as an SVP.[8] (See *People v. Watson, supra,* 46 Cal.2d a p. 836.)

## VI. *Disposition*

The order of commitment is affirmed.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.

On May 7, 2001, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 25, 2001. Brown, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.

---

[8]Even if defendant had properly raised hearsay objections to the other evidence he challenges on appeal, we would reach the same conclusion that its admission was harmless.