Filed 11/14/13  P. v. Chaney CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

<table>
<tr><td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ELDRIDGE CHANEY,<br><br>    Defendant and Appellant.</td><td>H037202<br>(Monterey County<br> Super. Ct. No. SC006639)</td></tr>
</table>

Eldridge Chaney appeals from the denial of his petition for conditional release from civil confinement as a sexually violent predator (SVP).  He contends that (1) the trial court erred by proceeding under the wrong provision of the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.)[1] and that his trial counsel rendered ineffective assistance by inviting the error and/or forfeiting the issue; (2) the trial court violated his equal protection rights by requiring him to bear the burden of proving his suitability for conditional release; (3) the trial court violated his procedural due process rights, his constitutional rights to privacy, the psychotherapist-patient privilege, and public policy when it ordered production of his written treatment assignments; (4) the trial court violated his due process rights when it denied his request

_____

[1]     Subsequent statutory references are to the Welfare and Institutions Code unless otherwise noted.

to present "rebuttal" witnesses; (5) the cumulative effect of the trial court's errors denied him a fair trial; (6) he is entitled to a different judge on remand; and (7) the deputy district attorney who tried the case must be disqualified on remand. We conclude that Chaney's counsel rendered ineffective assistance by seeking relief under section 6608. We reject Chaney's other arguments. We reverse the judgment and remand the matter for a new hearing under section 6605.

## I. Background

Chaney was found to be an SVP in 2000 and committed to the custody of the Department of Mental Health (DMH)[2] for treatment. In May 2010, Coalinga State Hospital (CSH) psychologist Nameeta Sahni conducted the annual examination that section 6605 requires and prepared a declaration stating that Chaney could be effectively treated in the community with adequate supervision. CSH's acting medical director Robert Withrow, M.D. disagreed with Sahni's opinion and so informed the superior court judge who had committed Chaney.

Three months later, CSH staff met to determine whether Chaney satisfied the criteria for advancement to Phase V outpatient treatment. The meeting was chaired by Dr. Withrow and attended by, among others, psychiatrist Dr. Peter Lavalle; social worker and head of the enhanced treatment program Ernest Marshall; senior psychologist in charge of the group program Virginia Greer; psychologist Steven Arkowitz, the clinical director of Liberty Conditional Release Program (Liberty CONREP), which contracts with the DMH to provide conditional release services to the SVP population; and Alan Stillman, Liberty CONREP's community program director. The meeting, which included

---

[2] The SVPA was amended effective June 27, 2012 to reflect that the DMH is now the State Department of State Hospitals and the director of mental health is now the director of state hospitals. (See *People v. Gonzales* (2013) 56 Cal.4th 353, 356 (*Gonzales*); Stats. 2012, ch. 24, §§ 63, 65, 138-146, pp. 85, 117-126.) We use the prior nomenclature, which was in effect when the events here at issue occurred.

a group interview of Chaney and "a lengthy assessment of his problem areas and how he would deal with them," ended with a consensus decision to recommend his conditional release.

After the meeting, Dr. Lavalle prepared a memorandum from CSH's then acting medical director Jagsir Sandhu, M.D. to the DMH's director, notifying him that Chaney had been recommended for conditional release.

On December 2, 2010, Chaney filed a "Motion for Conditional Release Pursuant to . . . Sections 6607/6608" in which he asserted that the DMH, "by and through its agents" at CSH, had provided a section 6607, subdivision (a) recommendation to request a section 6608 hearing.

On April 4, 2011, the trial court ordered CSH's then acting medical director Dr. Withrow to provide an updated recommendation "concerning the pending W&I 6608 petition for outpatient treatment filed by [Chaney]," and Dr. Lavalle prepared a letter recommending Chaney for outpatient treatment.

Dr. Lavalle testified at Chaney's probable cause hearing on April 28, 2011. Dr. Lavalle had been a psychiatrist at CSH since July 2009, and one of his duties as the forensic consultant to CSH's medical director was to prepare Phase V recommendation letters. He authored the letters recommending Chaney's conditional release. The letters were based on his review of Chaney's medical records and interviews with his treatment providers and staff members. Dr. Lavalle had never been Chaney's direct provider, nor had he interviewed or evaluated him, "[w]ith the exception of overhearing his conversations and watching his activity." He had an office in Chaney's unit from July to December 2010, but had "less than a dozen" contacts with him during that time.

Psychologist Arkowitz testified that he had known Chaney since 2002 and had attended his last three staffings. Although Liberty CONREP does not, "technically, have a vote in that process," the staff at CSH, including the medical director, "do pay attention

3

to our input," Arkowitz told the court, and he had "significant input" into Chaney's Phase V staffing.

Arkowitz had "many . . . formal and informal interactions" with Chaney and "full access to [Chaney's] records." In evaluating a person's progress at CSH, Arkowitz typically reviewed treatment plans and annual assessments, and he "paid a lot of attention to . . . the PPG [penile plethysmograph] assessments, polygraph exams, [and] psychological testing." He reviewed "the day-by-day notes of how the client is doing," treatment notes, and notes from job supervisors. He did not review Chaney's written treatment assignments.

In an evaluation prepared after Chaney's Phase V staffing, Arkowitz concluded that Chaney "is now seen as a suitable candidate for conditional release . . . ." In the section of the report labeled "Potential for reoffense *and* basis for determination," Arkowitz wrote that evaluators estimated Chaney's risk of conviction for another sexual offense as moderate to high compared to other sex offenders and that Chaney's diagnosis of antisocial personality disorder could increase his risk for reoffense. "It is difficult to assess Mr. Chaney's current degree of sexual self-regulation," Arkowitz wrote. Noting that early phallometric assessments had shown "a deviant sexual interest in sexually aggressive acts," Arkowitz reported that Chaney had "completed behavioral counter-conditioning treatments to address this issue and now displays a nondeviant sexual arousal profile." Arkowitz conceded on cross-examination, however, that "there's ways to, in essence, beat the PPG."

In the section of the report labeled "Awareness of precursors," Arkowitz wrote that "Chaney has stated that he believed each of his victims had rejected him and mistreated him. As a result, he wanted revenge on them." In Arkowitz's opinion, cognitive behavior therapy had given Chaney a mechanism to identify and correct any such thoughts.

4

Responding to concern that the reports contained "conclusionary statements that he's taken classes and that he seems to be . . . more of a thinking person, but no real discussion . . . how, if he has those thoughts, he's going to . . . not act on them," Arkowitz testified that patients in the phase program complete written treatment assignments and that Chaney "probably had a folder . . . where he has addressed those specific things . . . ."

"That's . . . the kind of thing I wish I could look at," the trial court stated, noting that because the written assignments reflected Chaney's "independent thought process," they would be far more helpful than "someone else summarizing something and I'm not quite sure exactly what context those descriptions come in and I don't know who the individual is that is describing them." Defense counsel noted Arkowitz's concern that the assignments "would be misused and taken out of context," but agreed to ask Chaney if he still had them. "And you understand the previous objections I've made," he added, referring to his earlier unsuccessful motion to quash a subpoena for Chaney's mental health records, "but I assume the Court would overrule those objections . . . ." "[T]his would be the Court's order," the court replied. "[W]e would all agree that [Dr. Lavalle] can just mail them [to] the court, maybe like a subpoena duces tecum type of thing . . . ."

Called to the stand a month later, Chaney was questioned by counsel and by the court about his offenses, his treatment, and his relapse prevention plans. He authenticated his written treatment assignments, and they were admitted into evidence as court exhibit 1.

The trial court denied Chaney's petition for conditional release. The court had spent "a good deal of time" looking at and had become "very familiar" with the evidence. It considered Chaney's testimony "the most, absolute most important evidence in this case." Aspects of that testimony reflected that Chaney had "learned . . . what the image is that he is to project in order to be normal." "The problem is that when he talks about it, it sounds like something out of a textbook that has been memorized. It sounds rote. It

5

sounds superficial. It is superficial. It sounds canned." The court gave examples where Chaney had avoided directly answering questions until, "[e]ventually, you are asked something so direct you can't -- you can't avoid it." It described Chaney's testimony as "at times incredible." "[Y]our answer to the question . . . of what you were thinking about when you were frequently masturbating, during a time where [phallometric assessments showed] you were excited by deviant sex, is that you only thought about that one time. No one believed that. Not only that, you didn't. Your demeanor, when you answered that question, was you knew you were lying." "I am trying to judge whether or not you're going to be transparent," the court told Chaney. "You're not, yet. And you'll hide it when you think it's the wrong thing to say, when you think it will get you in trouble. And that's dangerous," the court told him, especially when combined with his particular triggers—e.g., rejection and being told what to do. "[T]hose two triggers, if you're released into the community, are going to be your life. You are going to be told what to do, you're going to be regulated, you're going to be controlled, and those are triggers for you. You're going to be rejected."

Although the court felt Chaney was "beginning to learn about" empathy, it found his understanding "very superficial" and his answers "canned" and "rote." The court also found that Chaney continued to become angry too often, noting his testimony that when he became angry, "nine times out of ten, even in your own estimation, it was groundless and inappropriate."

The "other critical aspect" of the trial court's decision was a finding that Chaney lacked insight about his mental disorder. Chaney initially testified that he did not perceive himself as having any kind of psychological disorder at all in terms of desiring sex from nonconsenting women. He later conceded that he "had to have had" a mental disorder. When challenged about his use of the past tense, he finally admitted, "I *have* a mental disorder based on what I did with my victims. I have a mental disorder based on my history of alcoholism. And those two things will probably be with me for the rest of

6

my life, but they're two things that I'm working on every day. They're there. *I don't deny them.* I take full responsibility for them." (Italics added.) The court concluded that Chaney's insight was "developing" but had not "matured in a way that gives the Court any confidence whatsoever" that he would not reoffend. It was "too soon to let you out, even under supervised release." "So it's the decision of the Court that the Petitioner has not met its burden. Quite the contrary." The court ordered Chaney returned to CSH, and Chaney filed a timely notice of appeal.

## II. Discussion

### A. Section 6605 Versus 6608

Chaney contends that the trial court erred by proceeding under section 6608 instead of under section 6605 and that his trial counsel rendered ineffective assistance by inviting the error and/or forfeiting the issue. We agree that his trial counsel rendered ineffective assistance.

We reject Chaney's claim of trial court error. The SVPA permits SVP's to petition for conditional release under section 6605 (with the DMH's authorization after a favorable annual review) or under section 6608 (without the DMH's concurrence). (Former §§ 6605, subd. (b), 6608, subd. (a); *People v. Landau* (2011) 199 Cal.App.4th 31, 38-39 (*Landau*); *People v. Smith* (2013) 212 Cal.App.4th 1394, 1398-1399, 1404 (*Smith*).) Chaney elected to proceed under section 6608. It was not the trial court's role to question that choice. (*See Smith*, at p. 1407.) Trial court judges must remain "'detached, fair and impartial.'" (*People v. Scott* (1997) 15 Cal.4th 1188, 1206.) "The court may not . . . assume the role of either the prosecution or the defense." (*People v. Cook* (2006) 39 Cal.4th 566, 597.) Since Chaney cannot fault the trial court for proceeding under provisions that Chaney expressly invoked, we turn our attention to his ineffective assistance claim.

7

### 1.  Standard of Review

A defendant seeking reversal for ineffective assistance of counsel must prove both deficient performance and prejudice.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 218 (*Ledesma*); *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  The first element "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  (*Strickland,* at p. 687.)  The proper measure of attorney performance is "reasonableness under prevailing professional norms."  (*Id*. at p. 688.)  The court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct."  (*Id.* at p. 690.)  "Judicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate distorting effects of hindsight. . . ."  (*Id.* at p. 689.)  When counsel's conduct can reasonably be attributed to sound strategy, a reviewing court will presume the conduct was the result of a competent tactical decision, and a defendant must overcome that presumption to establish ineffective assistance.  (*Ibid.*)  However, "deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified.  '[Deference] is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions.  Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance."  (*Ledesma*, at p. 217.)

"Second, the defendant must show that the deficient performance prejudiced the defense."  (*Strickland*, *supra*, 466 U.S. at p. 687.)

### 2.  Overview of the Relevant SVPA Provisions

Enacted to identify, confine, and treat inmates with mental disorders predisposing them to commit violent criminal sexual acts, the SVPA was " 'designed to ensure that the committed person does not "remain confined any longer than he suffers from a mental

abnormality rendering him unable to control his dangerousness." [Citation.]' " (*People v. McKee* (2010) 47 Cal.4th 1172, 1186 (*McKee*); *People v. Allen* (2008) 44 Cal.4th 843, 857.)  Before its amendment in 2006, the SVPA provided for a two-year commitment, renewable for successive terms if the People proved beyond a reasonable doubt that the committed person remained an SVP.  (Former § 6604; Stats. 1995, ch. 763, § 3.)  There were two ways a committed SVP obtained review of his or her current mental condition to determine if civil confinement was still necessary.  (*McKee*, at p. 1186.)  Section 6608 permitted the SVP to petition the court for *conditional* release to a community treatment program, while section 6605 described a procedure, initiated by the DMH, that could lead to the committed person's *unconditional* release.  (*People v. Cheek* (2001) 25 Cal.4th 894, 902 (*Cheek*); *McKee*, at p. 1186.)  The conditional versus unconditional release distinction between the two sections was eliminated when California voters approved Proposition 83.  (*Smith*, *supra*, 212 Cal.App.4th at pp. 1398-1399.)

### 3.  Proposition 83

Proposition 83, an initiative measure approved by the electorate on November 7, 2006, amended the SVPA.  (*McKee*, *supra*, 47 Cal.4th at p. 1183.)  Among other modifications, Proposition 83 changed an SVP commitment from a two-year term to an indeterminate term and substantially changed the procedures for seeking release.  (*McKee*, at p. 1186.)

After Proposition 83, section 6605 continued to require yearly examinations of a committed SVP's mental condition.  (*McKee*, *supra*, 47 Cal.4th at p. 1186.)  "However, Proposition 83 added new provisions to section 6605 regarding the DMH's obligations: Pursuant to section 6605, subdivision (a), the DMH now files an annual report in conjunction with its examination of SVP's that 'shall include consideration of whether the committed person currently meets the definition of a sexually violent predator *and whether conditional release to a less restrictive alternative* or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately

9

protect the community.'  Subdivision (b) now provides that '[i]f the [DMH] determines that either:  (1) the person's condition has so changed that the person no longer meets the definition of a sexually violent predator, *or (2) conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community*, *the director shall authorize the person to petition the court for conditional release to a less restrictive alternative* or for an unconditional discharge.'  (§ 6605, subd. (b).)  If the state opposes the director's petition, then, as under the pre-Proposition 83 statute, it must prove beyond a reasonable doubt that the person still meets the definition of an SVP."  (*McKee*, at p. 1187, italics added.)

"In the event the DMH does *not* authorize the committed person to file a petition for release pursuant to section 6605, the person nevertheless may file, as was the case with the pre-Proposition 83 Act, a petition for conditional release for one year and subsequent unconditional discharge pursuant to section 6608.  (§ 6608, subd. (a).)  Section 6608, subdivision (i), which was also unamended by the Act, provides:  'In any hearing authorized by this section, *the petitioner shall have the burden of proof by a preponderance of the evidence.*'  (Italics added.)"  (*McKee*, *supra*, 47 Cal.4th at p. 1187.)

After 2006, then, an SVP may seek conditional release *either* under section 6605 (with the DMH's authorization after a favorable annual review) *or* under section 6608 (without the DMH's concurrence).  (*Smith*, *supra*, 212 Cal.App.4th at pp. 1398-1399.)

## 4.  Analysis

Chaney argues that his counsel should have invoked section 6605, because his "application for release was approved by the DMH" inasmuch as he received a "favorable annual review" in 2010.  The Attorney General counters that Chaney is "mistaken" because his petition was *not* authorized by the DMH *as a result of his annual review* but was instead initiated by Chaney himself in response to Dr. Sandhu's September 30, 2010 recommendation after the Phase V staffing.  We agree with Chaney.

The version of section 6605 in effect when Chaney filed his petition provided that "[i]f the [DMH] determines [as a result of the SVP's annual review] that . . . conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community, the director *shall* authorize the person to petition the court for conditional release . . . ." (Former § 6605, subd. (b); Stats. 2009, ch. 61, § 1, italics added.) Sahni, Chaney's examining psychologist, made that determination in her report of his 2010 examination. CSH's medical director disagreed. That created a conflict.

The conflict highlighted an ambiguity in the statutory language and squarely raised the issue of what the Legislature meant by "[i]f the [DMH] determines." (Former § 6605, subd. (b).) If the Legislature meant that "[i]f the [the examining psychiatrist or psychologist] determines [as a result of the SVP's annual review] that . . . conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community, the director shall authorize the person to petition the court for conditional release . . . ," then the director was statutorily required to authorize the petition, and Chaney could have invoked section 6605 notwithstanding the director's disagreement with Sahni's determination. (Former § 6605, subd. (b); see *Rice v. Superior Court* (1982) 136 Cal.App.3d 81, 86 ["where the Legislature employs the terms 'shall' and 'may' in different portions of the same statute, it must be concluded that the Legislature was aware of the different meanings of these words and intended them to denote mandatory and directory requirements, respectively."].)

If, on the other hand, the Legislature meant that "[i]f the [the director of the DMH or, alternatively, CSH's medical director] determines that . . . conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community, the director shall authorize the person to petition

11

the court for conditional release . . . ," Chaney's petition was properly brought pursuant to section 6608. (Former § 6605, subd. (b).)

The ambiguity in the statutory language gave Chaney's trial counsel an opportunity to make a plausible argument that the DMH had "determine[d]" that Chaney was a suitable candidate for conditional release and that the director was required to authorize his filing of a section 6605 petition. (*Landau*, *supra*, 199 Cal.App.4th at pp. 38-39.) That argument, if successful, would have shifted the burden of proof from Chaney to the State. (Former § 6605, subd. (d).) Chaney would not have had the burden of proving by a preponderance of the evidence that he "would [not] be a danger to the health and safety of others in the community in that it [was not] likely that he . . . [would] engage in sexually violent criminal behavior due to his . . . diagnosed mental disorder if under supervision and treatment in the community." (Former § 6608, subd. (d); Stats. 2007, ch. 571, § 3.) Instead, the burden would have been on the People to negate that claim beyond a reasonable doubt. (Former § 6605, subd. (d).)

We acknowledge that we must " ' " ' "accord great deference to counsel's tactical decisions,' " ' " that " ' " ' "[t]actical errors are generally not deemed reversible, and [that] counsel's decisionmaking must be evaluated in the context of available facts.' [Citation.]" ' ' " (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147.) "To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . . ' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) Here, there could be no satisfactory explanation for counsel's failure to identify the ambiguity in the statutory language and attempt to take advantage of it to his client's benefit. (*People v. Roberts* (2011) 195 Cal.App.4th 1106, 1129-1130.) Of course, there was no guarantee that the argument would succeed. But it was a reasonable interpretation of the statutory

12

language, and Chaney had nothing to lose by advancing it. His trial counsel's failure to at least raise the issue cannot reasonably be attributed to sound strategy.

Shortly after this case was tried, the Fourth District Court of Appeal, presented with facts similar to those presented here, held that "when section 6605, subdivision (b) requires the director to authorize a person committed as an SVP to file a petition for release when 'the [DMH] determines' the person meets the criteria set forth in the statute, it means when the annual report of its evaluator concludes the person meets the criteria." (*Landau*, *supra*, 199 Cal.App.4th at p. 39.) The court reasoned that "[i]n initiating SVP proceedings, the director forwards a request for the filing of a petition to commit the person as an SVP, if 'the [DMH] determines that the person is [an SVP] . . . .' (§ 6601, subd. (h).)" (*Landau*, at p. 39.) Since the initial identification "is accomplished by mental evaluations performed by professionals selected by DMH," the court found it "evident that DMH's determination that the person qualifies as an SVP equates to two evaluators having found the person qualifies as an SVP." (*Ibid.*) Similarly, identifying committed persons who no longer qualify as SVP's or whose best interests require conditional release, "is accomplished by providing yearly mental evaluations also performed by professionals selected by DMH." (*Id.* at pp. 38-39.) The court concluded that "when section 6605, subdivision (b) requires the director to authorize the committed person to file a petition '[i]f the [DMH] determines' the person no longer qualifies as an SVP or conditional release is in his or her best interest . . . , it is apparent the same language again refers to the report prepared under the statutory scheme. 'When the Legislature uses the same language . . . , we can infer the same result is intended.'" (*Landau*, at p. 39, quoting *People v. McKay* (2002) 27 Cal.4th 601, 622.) Thus, the director of CSH should have authorized Landau's petition for release, and the trial court should have treated the petition, which invoked both sections 6605 and 6608, as having been filed under section 6605. (*Landau*, at pp. 39-40.)

13

That *Landau* had not yet been decided when Chaney filed his petition does not, in our view, excuse his trial counsel's failure to spot the obvious issue raised by the conflicting conclusions that Chaney's 2010 annual report generated and, at a minimum, invoke both sections in the petition. (See *Smith*, *supra*, 212 Cal.App.4th at p. 1408 [holding that despite the absence of authority clarifying a different ambiguity in section 6605, Smith's trial counsel's failure "to at least recognize the issue and to urge the court to proceed under section 6605" constituted deficient performance.].) We think counsel's performance was deficient.

That deficient performance prejudiced Chaney. The trial court concluded that he "ha[d] not met his burden." Although the ruling was based in large part on the court's determination that Chaney had not yet internalized the lessons he had learned, the court also acknowledged that he had "come a long way" and "appreciate[ed] the concepts that should control [his] conduct." "I look and I see progress," the court said. "I see Mr. Chaney . . . being sincere in his testimony that his intention is not to reoffend, his intention is to use the tools that he's been trained to use to cope with deviant thoughts, with distorted thinking, those kinds of things." The court also acknowledged that "all of the experts that came in and testified, who are involved closely in this program, perceive Mr. Chaney as an individual who deserves this opportunity to be supervised in the community." The evidence reflected CSH and Liberty CONREP staff's unanimous support for Chaney's conditional release. Before the trial concluded, moreover, Chaney had received his 2011 annual report which, like his 2010 annual report, recommended his conditional release. This time, however, Dr. Withrow concurred in the recommendation. The parties stipulated to the admission of the 2011 annual report. In view of the strong evidence supporting Chaney's conditional release and notwithstanding the trial court's negative credibility determinations, we think there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" had the state had the burden of proving its case beyond a reasonable doubt.

14

(*Strickland*, *supra*, 466 U.S. at p. 694; *In re Jones* (1996) 13 Cal.4th 552, 561.)  We conclude that if intervening events have not rendered the matter academic, Chaney is entitled to a new hearing under the procedures specified in section 6605.[3]

### B.  Order to Produce Written Treatment Assignments
### 1.  Asserted Violation of Procedural Due Process

Chaney claims the trial court violated his procedural due process rights when it ordered him to produce his written treatment assignments "without any notice or opportunity to litigate the issue, and without any apparent authority to issue the order." His failure to object in the trial court on any procedural ground has forfeited the procedural due process issue on appeal.  Anticipating that problem, he asserts as a fallback argument that any forfeiture occasioned by his trial counsel's failure to object in the trial court constituted ineffective assistance, since there could be "no tactical reason for failing to raise the due process and procedural objections relating to the trial court's failure to follow proper discovery procedures."  We reject both his procedural due process and his ineffective assistance claims.

"'An elementary and fundamental requirement of due process in any proceeding . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.  [Citations.]  The notice must be of such nature as reasonably to convey the required information [citation], and it must afford a reasonable time for those interested to make their appearance [citations].'  [Citations.]"  (*Traverso v. People ex rel.*

---

[3]    Our resolution of this issue makes it unnecessary for us to address Chaney's argument that the SVPA violates equal protection because section 6608 requires SVP's to establish suitability for conditional release by a preponderance of the evidence while MDO's are held to the less stringent probable cause standard.  (*Landau*, *supra*, 199 Cal.App.4th at p. 40, fn. 2; *People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1501, 1503, fn. 8.)

*Dept. of Transportation* (1993) 6 Cal.4th 1152, 1169-1170, italics omitted; *Anderson Nat. Bank v. Luckett* (1944) 321 U.S. 233, 246.)

Chaney had reasonable notice that the trial court wanted to review his written treatment assignments. He was present when the court, alerted to their existence by Arkowitz's testimony, expressed a desire to see them. Chaney's counsel voiced several objections in colloquy later that afternoon, but then concurred, albeit reluctantly, with the court's suggestion that "we would all agree that [Dr. Lavalle] can just mail them into the court, maybe like a subpoena duces tecum type of thing --." At no time on that day or during the two-week interim before the trial court actually released the documents to the parties did Chaney's trial counsel suggest briefing and further argument on the procedural due process or any procedural issue, nor did he urge the court to reconsider its ruling.

We reject Chaney's assertion that "by the time the next hearing occurred, the documents had already been seized *and reviewed by the court.*" (Italics added.) The transcript of the May 11, 2011 hearing at which the trial court released the documents for duplication and distribution to the parties reflects that the court had not yet reviewed them. It was not until a week after that, when Chaney appeared to testify, that the court told the parties it had reviewed the assignments.

In sum, Chaney had notice that the court wanted to review his assignments. He had an opportunity to present his objections. We therefore reject his assertion that he had no opportunity to litigate the issue. He asserted his objections through his counsel on April 28 and reiterated them on May 11, 2011. His procedural due process rights were not violated.

Chaney argues that his trial counsel's failure to object on procedural grounds constituted ineffective assistance. Not so. Because his procedural due process rights were not violated, an objection on that ground would have been meritless. "Representation does not become deficient for failing to make meritless objections." (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

16

An objection that the trial court lacked authority to issue the order would have fared no better. "As has often been stated, a trial court has inherent power, independent of statute, to exercise its discretion and control over all proceedings relating to the litigation before it. [Citation.] One phase of such power . . . is the power to obtain evidence upon which the judgment of the court may rest. [Citation.]" (*Johnson v. Banducci* (1963) 212 Cal.App.2d 254, 260; see Code Civ. Proc., § 187.) Chaney has not shown deficient performance. (*Strickland*, *supra*, 466 U.S. at p. 687; *Ledesma*, *supra*, 43 Cal.3d at p. 218.) Nor has he shown prejudice, because the result would have been exactly the same had the trial court, upon a timely objection, rigorously adhered to the formal procedures that Chaney maintains were required.

" '[T]he Civil Discovery Act applies to SVPA proceedings . . . .' [Citation.] The act is 'applied in each SVPA proceeding on a case-by-case basis.' [Citation.] The discovery rules are 'liberally construed in favor of disclosure and the trial court is vested with wide discretion to grant or deny discovery. [Citation.]' [Citation.]" (*People v. Landau* (2013) 214 Cal.App.4th 1, 25.)

Here, Chaney concedes that the district attorney could have subpoenaed the documents or requested their production pursuant to Code of Civil Procedure section 2031.010. He claims, however, that the district attorney's inaction forfeited that opportunity. But he cannot fault the district attorney for failing to seek production of his written treatment assignments given his affirmative representation, in his March 24, 2011 letter requesting discovery from the prosecution, that "Mr. Chaney has attached to his Motion for Conditional Release *all the records he has* in the above entitled matter . . . ." (Italics added.)

Nor can Chaney argue that "there was no good cause to permit this late discovery." (Code Civ. Proc., § 2024.050, subds. (a), (b)(1)-(2).) Given the misrepresentation, the undisputed materiality of the assignments, and Chaney's reliance, in large part, on the same substantive objections that had just been thoroughly briefed,

17

argued, and rejected on his unsuccessful motion to quash the subpoena for his mental health records, we think it highly likely that the trial court would have granted a short continuance and reopened discovery to permit the district attorney to request production of the assignments, had counsel objected to the shortcut procedure the court employed instead. (See *Lee v. Superior Court* (2009) 177 Cal.App.4th 1108, 1123-1124 ["General civil discovery methods . . . have been held to be available to litigants in SVPA proceedings."].) The documents would have been produced. Chaney would have been asked the same questions at trial. He would have given the same responses. There is not "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694; *Jones*, *supra*, 13 Cal.4th at p. 561.) Chaney's ineffective assistance claim fails.

### 2. Asserted Violation of Psychotherapist-Patient Privilege

Chaney claims the trial court's order to produce his treatment assignments violated the psychotherapist-patient privilege. We disagree.

"In California, as in all other states, statements made by a patient to a psychotherapist during therapy are generally treated as confidential and enjoy the protection of a psychotherapist-patient privilege." (*Gonzales*, *supra*, 56 Cal.4th at p. 371; Evid. Code, § 1014.) Despite its broad and protective nature, however, " 'the psychotherapist-patient privilege is legislatively created and is not absolute.' " (*People v. Martinez* (2001) 88 Cal.App.4th 465, 483 (*Martinez*); *Gonzales*, at p. 372.) Statutorily-created exceptions include the dangerous patient exception, which provides that "[t]here is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." (Evid. Code, § 1024.) This exception "is an expression of the Legislature's determination that the value of safeguarding confidential psychotherapeutic communications, as great as it is, is outweighed by the public interest

18

in protecting foreseeable victims from physical harm." (*San Diego Trolley, Inc. v. Superior Court* (2001) 87 Cal.App.4th 1083, 1091 (*San Diego Trolley*).) Evidence Code section 1024 "does not automatically render the psychotherapist-patient privilege inapplicable in SVPA proceedings." (*Gonzales*, at pp. 380-381.) But as our high court has "emphasize[d]," that "does not mean that [it] cannot properly come into play in an SVPA proceeding." (*Ibid.*)

In *People v. Lakey* (1980) 102 Cal.App.3d 962 (*Lakey*), a mentally disordered sex offender (MDSO) challenged the admission, in his recommitment proceeding, of statements he had made during inpatient therapy sessions. (*Id.* at pp. 967-968, 970.) In rejecting the claim, the court acknowledged that " 'an environment of confidentiality of treatment is vitally important to the successful operation of psychotherapy,' " and "the effectiveness of the treatment given . . . probably would be improved if complete confidentiality were accorded every statement made by a person involuntarily confined for the treatment of their mental disorders." (*Id.* at p. 976.) "However," the court recognized, "the psychotherapist/patient privilege is legislatively created and is not absolute. [Lakey] has been confined as an MDSO because he took the life of another human being and is dangerous. The purpose of his confinement is not merely to treat his mental disorder, but to protect society. An important purpose of the close supervision given persons who are confined as MDSOs is to gather information through which it is possible to predict their future behavior. It seems apparent that one legislative purpose in providing psychotherapy for MDSOs is to monitor their progress so that the decision to release the MDSO from confinement may be based upon as much information as possible. We cannot find any legislative intent to exclude testimony such as that presented in this matter because of any psychotherapist/patient privilege." (*Lakey*, at pp. 976-977.)

The *Lakey* court found support for its decision in Evidence Code section 1024. (*Lakey*, *supra*, 102 Cal.App.3d at p. 977.) "The proceeding below was premised upon the

belief of defendant's psychotherapist, and the medical staff at Atascadero State Hospital, that [Lakey] constitutes 'a serious threat of substantial harm to the health and safety of others,' as provided in [the MDSO statute].  As the Supreme Court stated in *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 442, 'the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others.  The protective privilege ends where the public peril begins.'" (*Lakey*, at pp. 976-977.)

This court relied on *Lakey* when it concluded in *Martinez* that records of inpatient psychotherapy treatment provided during Martinez's previous commitment as an MDSO were properly admitted in a later proceeding to determine whether he qualified as an SVP.  (*Martinez*, *supra*, 88 Cal.App.4th at pp. 483-484.)  "We agree with the reasoning in *Lakey*," the court explained, "and consider it applicable in the context of an SVP proceeding.  The SVPA protects the public from sexual predators by detaining them and providing treatment until the mental condition causing their disorder has abated.  The determination that a disorder has abated requires a full assessment of the person's current mental condition, including reference to treatment records and progress in therapy.  To this end, we conclude that the psychotherapist-patient privilege did not preclude [the testifying psychologists] from considering [Martinez's] therapy records because the privilege never attached to his communications with the treatment staff at ASH or the MDSO evaluator." (*Martinez*, at p. 484.)

*Martinez* and *Lakey* stand for the proposition that in the context of an MDSO or SVP commitment or recommitment proceeding, the psychotherapist-patient privilege does not shield psychological treatment records created during a prior involuntary commitment.  Although those records are generated in the course of treating MDSO's and SVP's, they have an additional and equally important purpose:  to provide authorities with a professionally informed basis for determining when the committed person can be

20

safely released. Having been found at trial to pose a danger to the health and safety of others, persons involuntarily committed as MDSO's or SVP's cannot reasonably expect that their therapeutic communications will be absolutely privileged at future commitment or recommitment hearings. The very purpose of those proceedings is to determine whether the person is dangerous. The public safety benefit of a full assessment of the person's current mental condition, including review of all relevant treatment records, outweighs the more general public policy of treating patients' psychotherapeutic communications as confidential. Such records may reasonably be deemed to fall within Evidence Code section 1024's dangerous patient exception. (*Lakey*, *supra*, 102 Cal.App.3d at pp. 976-977; *Martinez*, *supra*, 88 Cal.App.4th at pp. 483-484.)

Chaney attempts to distinguish *Lakey* and *Martinez*, but we do not find his arguments persuasive. We are not convinced that a proceeding to determine whether a committed SVP is suitable for conditional release is materially different from a commitment or recommitment proceeding, as all three focus on an assessment of the committed person's current mental condition to determine whether the person poses a danger to the health and safety of others. Nor are we persuaded by Chaney's assertion that his written treatment assignments are nondiscoverable because they "were deliberately kept out of his medical records by the DMH." The civil discovery rules permit "any party" to obtain discovery regarding "any matter, not privileged," that is relevant to the subject matter of the pending action or reasonably calculated to lead to the discovery of admissible evidence. (Code Civ. Proc., § 2017.010.) It was undisputed below that, as Arkowitz acknowledged, "there would be lots of valuable information in [Chaney's written treatment assignments]." Neither Chaney nor the DMH can shield that information from discovery if it falls within a statutory exception to the psychotherapist-patient privilege, because the Legislature has determined that "as important as psychotherapeutic confidentiality is, even its value may be outweighed by other societal interests." (*San Diego Trolley*, *supra*, 87 Cal.App.4th at p. 1091.) It is the Legislature's

21

determination that controls—not DMH's. (*In re Lifschutz* (1970) 2 Cal.3d 415, 427 ["Although petitioner argues that, as a matter of social as well as medical policy, the benefits to be derived from a broadening of the existing privilege would outweigh the detriments resulting from a narrowing of evidence available in litigation, the balancing of those alternatives remains with the Legislature."] We reject Chaney's contention that the trial court's order to produce his treatment assignments violated the psychotherapist-patient privilege.

### 3. Asserted Violation of State and Federal Constitutional Rights to Privacy

Chaney claims the trial court's order to produce his treatment assignments violated his state and federal constitutional rights to privacy. We disagree.

Article I, section 1 of the California Constitution provides that "[a]ll people" have certain "inalienable rights," including a right to privacy. "[T]o prove a violation of this constitutional guarantee, one must establish [1] a legally protected privacy interest, [2] a reasonable expectation of privacy in the circumstances, and [3] conduct constituting a serious invasion of the privacy interest." (*Martinez*, *supra*, 88 Cal.App.4th at p. 474, citing *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 37 (*Hill*).) "Invasion of a privacy interest is not a violation of the state constitutional right to privacy," however, "if the invasion is justified by a competing interest." (*Hill*, at p. 38.)

Applying these principles in *Martinez*, this court held that the district attorney's review of Martinez's psychological treatment records did not violate his state constitutional right to privacy. (*Martinez*, *supra*, 88 Cal.App.4th at p. 474.) "It is settled that a person's medical history, including psychological records, falls within the zone of informational privacy protected under [the constitutional provision]," the court explained. (*Id*. at pp. 474-475.) But Martinez's expectation of privacy was "substantially diminished—if not completely eliminated" by his consent to interviews with the evaluating psychologists and by the fact that the SVPA makes all relevant records, including psychological records and "especially those generated at [the state hospital],"

22

relevant to the determination whether a person qualifies as an SVP. (*Martinez*, at pp. 476-477; former § 6601, subds. (b)-(d), (h); see *People v. Sumahit* (2005) 128 Cal.App.4th 347, 351, 353 [SVP who declined to be interviewed recommitted based on evaluators' review of records, including notes by staff, psychologist notes, probation reports and court records].) The district attorney is entitled to review the evaluators' reports, moreover, and "'any other supporting documents'" must also be made available to him or her. (*Martinez*, at p. 477; former § 6601, subd. (d).) Finally, the prosecutor's review did not constitute a serious invasion of Martinez's privacy interests. (*Martinez*, at p. 478.) His mental state was the primary focus of the commitment proceeding, and the records had already been examined and relied upon by nontreating doctors. (*Ibid*.) The court concluded that the minimal invasion of Martinez's right to informational privacy was justified by the "compelling public interests behind the SVPA and the [district attorney's] duty to make an independent and informed decision . . . whether to file a petition." (*Id*. at p. 480.)

We reach the same conclusion here. Although Chaney's inpatient psychotherapy records, which include his written treatment assignments, fall within the zone of informational privacy protected by the California constitution, he could not reasonably expect the assignments to be kept private in a proceeding to determine whether he would be a danger to the health and safety of others "in that it is likely that he . . . will engage in sexually violent criminal behavior due to his . . . diagnosed mental disorder if under supervision and treatment in the community." (§ 6608, subd. (d).) By initiating the petition for conditional release, Chaney put his mental condition at issue. (See Evid. Code, § 1016.) He does not dispute that his assignments were highly relevant to the determination the trial court had to make. On the contrary, he concedes that had they been maintained in CSH's files, "they would almost certainly not be subject to either the psychotherapist-patient privilege or protected by his [constitutional] right to privacy. . . ." We have already rejected the file location distinction. (Code Civ. Proc., § 2017.010;

23

Evid. Code, § 1024; see *ante*, at pp. 21-22.) Thus, Chaney had, at best, a diminished expectation of privacy in his written treatment records.

Given that diminished expectation of privacy, any invasion of Chaney's interest was minimal. The assignments had already been reviewed by his treatment providers, shared with his fellow phase participants, and studied by outside clinicians. They were not widely disseminated, moreover, but were shared only with the court and with the district attorney in the limited context of determining Chaney's suitability for conditional release. This minimal invasion was more than justified by the compelling purpose of the SVPA and by the trial court's duty to make an informed and independent decision about Chaney's suitability for conditional release. The trial court's order did not violate Chaney's state constitutional right to privacy.

Nor did it violate his federal constitutional right to privacy. As our high court has noted, "the United States Supreme Court itself has not yet definitively determined whether the federal Constitution embodies even a *general* right of informational privacy." (*Gonzales*, *supra*, 56 Cal.4th at p. 384; see *Whalen v. Roe* (1977) 429 U.S. 589, 605-606 [assuming, without deciding, that such a right exists]; *NASA v. Nelson* (2011) __ U.S. __, [131 S.Ct. 746, 751-752].) The Ninth Circuit has held that the indiscriminate public disclosure of Social Security numbers "may implicate the constitutional right to informational privacy." (*In re Crawford* (9th Cir. 1999) 194 F.3d 954, 958.) "The right to informational privacy, however, 'is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest.' [Citation.]" (*Id*. at p. 959.) "[T]he relevant considerations will necessarily vary from case to case. In each case, however, the government has the burden of showing that 'its use of the information would advance a legitimate state interest and that its actions are narrowly tailored to meet the legitimate interest.' [Citation.]" (*Ibid*.) Applying this test in *Hubbs v. Alamao* (9th Cir. 2005) 360 F.Supp.2d 1073 (*Hubbs*), the court rejected an SVP's claim that disclosure of his medical information in an SVPA commitment proceeding violated his

24

constitutional right to privacy. (*Hubbs*, at p. 1082.) "[T]he State has a compelling governmental interest in identifying, confining and treating SVPs, who have been diagnosed as sexually violent and represent a distinct threat to the health and safety of the public," the court wrote. (*Ibid*.) Relying on *Martinez*, it noted that the SVPA expressly provides for the disclosure of relevant records not only to evaluators but also to others, including the prosecutor. (*Hubbs*, at p. 1082.) "Under such circumstances," the court concluded, "the balance falls squarely in the State's favor, and plaintiff's constitutional rights were not violated . . . ." (*Ibid*.) Chaney's federal constitutional privacy claim thus fails for the same reasons his state constitutional claim fails.

### 4. Asserted Violation of Public Policy

Chaney contends that the trial court's order to produce his treatment assignments violated public policy. It is in the interest of everyone, he points out, that SVPA treatment be as effective as possible, a goal that is advanced when patients are "honest and forthcoming" in their written work. Giving courts access to that work creates an incentive to be less honest and less forthcoming. That, Chaney asserts, led to a determination by mental health experts at the DMH "that these documents should not be part of the medical file and should not be available to the courts . . . ." Chaney claims "the trial court had no business overriding this policy . . . ." The essence of his argument is that public policy on this issue should be set by the DMH rather than by the Legislature. We have already rejected that argument.

### C. Asserted Denial of Right to Present Case in Full

Chaney claims the trial court violated his due process rights when it denied his request to present "rebuttal" witnesses.

### 1. Background

When Chaney finished testifying, the court asked if there was "any other evidence." The district attorney answered, "No," and defense counsel said nothing. The

court then asked counsel to prepare memoranda explaining "the structure" of conditional release and the extent of the court's continued involvement in the event it granted Chaney's petition. It set a hearing on that issue in three weeks. Two days before the scheduled hearing, the court told the parties it needed to continue the hearing because it wanted a transcript of Chaney's testimony and was having difficulty obtaining it. "I'm thinking a couple of weeks," the court said. At that point, defense counsel asked for "a date that we could have a full day of hearing, in case I bring the executive director or other facilitators down to testify." The court said it was not sure it could guarantee a full day, and it continued the matter to June 30, 2011.

On June 28, 2011, the defense moved to exclude electronic media coverage. On June 30, the court heard that matter, which included testimony by Liberty CONREP's community program director, first. It denied the motion.

Defense counsel then declared that he had two witnesses to present "in response to [Chaney's] testimony," to "fill out" or "to rebut to some extent" the inferences drawn from it. He proposed calling Chaney's social worker to testify about various aspects of his treatment and to provide "her ultimate opinion" on his suitability for conditional release. He also proposed calling Dr. Withrow to testify, "consistent with what the expert witnesses already presented," that the medical and psychological experts supported Chaney's conditional release.

"I thought we were done with the evidence," the court responded. "I thought Mr. Chaney was the last witness." "I thought you were finished after the other witnesses testified and it was *the Court* that was inclined to listen to Mr. Chaney." (Italics added.) The court said it understood counsel's earlier comment about additional witnesses to refer witnesses who would describe the structure of conditional release. The district attorney concurred in that understanding, noting that both parties had by that time submitted memoranda on the subject. The district attorney argued that the impact *on CSH* of the

26

release of Chaney's written assignments was irrelevant and that the other areas of testimony had already been addressed by other witnesses.

The trial court denied defense counsel's request as cumulative. "[N]ot only is it cumulative, but I do believe that I have accurately described where we were when we last left off before June 8th; and that was we were coming back for one purpose and that was to have a decision ultimately on the conditional release issue and then have further information provided to the Court . . . . I think in my mind [that further information] was actually part of the decision-making process."

The court stated a second basis for its ruling—that "these witnesses clearly were witnesses that were foreseeable, the information they had was foreseeable . . . I can't even call it rebuttal. You know, it's just additional. And . . . I don't see the significant relevance of it. [¶] It may be relevant, but in terms of 352 and in terms of anticipating what your case is going to be, they're the kind of witnesses that I would have expected to see up front. And even then, they would have been cumulative probably, on most issues."

## 2. Analysis

Chaney argues that the trial court's refusal to allow him to present "rebuttal" witnesses violated his "California statutory and constitutional rights as well as the due process clause of the Fourteenth Amendment." We disagree.

In our view, the trial court reasonably inferred from defense counsel's silence when the court asked if there was any other evidence that the defense had rested its case. That meant the defense had to seek leave to reopen its case to present further evidence. "A request to reopen for further evidence is addressed to the discretion of the trial court whose determination is binding on appeal in the absence of palpable abuse." (*Guardianship of Phillip B*. (1983) 139 Cal.App. 3d 407, 428 (*Phillip B*.).) Proposed rebuttal evidence that is merely cumulative is properly excluded. (*Pauly v. King* (1955) 44 Cal.2d 649, 661 (*Pauly*).) "And denial of a motion to reopen will be upheld if the

27

moving party fails to show diligence . . . ." (*Phillip B.*, at p. 428.) "It does not follow . . . that the discretionary denial of a motion to reopen warrants reversal. Only in rare instances involving evidence of crucial significance will reviewing courts reverse a decision where denial has resulted in such exclusion." (*Ibid.*)

We cannot say that the excluded evidence was of crucial significance. It was not rebuttal evidence, which "by definition . . . counters . . . the [opposing party's] case-in-chief," because it was undisputed that those who attended Chaney's Phase V staffing had unanimously recommended his conditional release and that CSH's then acting medical director had concurred in the recommendation. (*In re Brown* (1998) 17 Cal.4th 873, 889.)

Chaney argues, however, that he needed the proposed evidence to rebut *his own* testimony. A similar argument was rejected in *Lompoc Produce & Real Estate Co. v. Browne* (1919) 41 Cal.App. 607.) "[T]his is not a case of a refusal to permit a party to introduce evidence to overcome the testimony of the opposing party," the court noted. (*Id.* at p. 614.) "All the testimony upon the subject . . . was given by the appellant himself. He cannot claim to have been surprised by his own testimony, and should not object to its being given full credence. He should not be permitted to attempt to contradict it." (*Ibid.*)

In any event, the proposed testimony was merely cumulative, as defense counsel acknowledged when he told the trial court it would be "consistent with what the expert witnesses already presented." The evidence was, moreover, neither newly discovered nor even newly relevant, and Chaney offered no explanation why it could not have been presented earlier. Because he failed to show diligence and because the proposed testimony would have been cumulative, the trial court did not abuse its discretion in excluding it. (*Pauly*, *supra*, 44 Cal.2d at p. 661; *Phillip B.*, *supra*, 139 Cal.App.3d at p. 428.) Chaney was not denied "a meaningful opportunity to be heard on critical issues." His due process rights were not violated.

28

### D. Cumulative Error

Chaney contends that the cumulative effect of the trial court's errors violated his due process rights and deprived him of a fair trial. We have identified one instance of ineffective assistance and no trial court error. There is nothing to cumulate. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1225.)

### E. Request to Disqualify the Trial Judge and the Deputy District Attorney

Contending that the trial court's errors make it "impossible to imagine that [the trial judge] could, at this point, hear [the] case objectively," Chaney asks us to order that future proceedings be heard by a different trial court judge. We decline to do so.

" 'The power of the appellate court to disqualify a judge under Code of Civil Procedure section 170.1, subdivision (c), should be exercised sparingly, and only if the interests of justice require it. [Citation.]' [Citation.]" (*Landau*, *supra*, 199 Cal.App.4th at p. 40 ["Appellant has not shown that the interests of justice require disqualification of Judge Donahue [citation], the judge who presided over his SVP trial, from hearing further proceedings involving appellant and his status as an SVP."].)

Here, Chaney's request to disqualify the trial judge is expressly premised on his assertion that the judge improperly "seized" his written treatment assignments and "refused to permit [him] to present highly relevant and important evidence despite his clear right to do so." We have determined that the trial court's rulings were proper. We see no basis to disqualify the trial judge. (*Landau*, *supra*, 199 Cal.App.4th at p. 40.)

Chaney also seeks disqualification of the deputy district attorney who prosecuted his case "and any other employee contaminated by the confidential information." The basis of his claim, as stated in his reply brief, is that "if this Court determines that the trial court improperly ordered the production of [Chaney's] confidential documents, then . . . the District Attorney's Office must destroy or return the copies of the documents in its possession and any district attorneys who had worked on the case must be disqualified

29

from any further activities in the case." Because we have determined that the trial court's order was proper, we have no basis for disqualifying the deputy district attorney.

### III. Disposition

The judgment is reversed, and the matter is remanded for a new hearing under the procedures specified in section 6605. The parties shall be given leave to file supplemental pleadings.

_____

Mihara, J.

WE CONCUR:


_____

Elia, Acting P. J.


_____

Márquez, J.